UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

In re:

JAMES MORRIS RUDNICK,

Debtor.

Case No. 20-40124-KKS

Chapter 7

**SC ADVISORS 7's RESPONSE AND OBJECTION TO
TRUSTEE'S MOTION TO APPROVE COMPROMISE
OR SETTLEMENT WITH DEBTOR, JAMES RUDNICK**

SC Advisors 7 ("SC Advisors"), a creditor in this matter, hereby responds to Trustee's Motion to Approve Compromise or Settlement with Debtor, James Rudnick (Doc. No. 147), and objects to the settlement proposed therein. The proposed settlement falls far short of the factors set forth in *Wallis v. Justice Oaks II, Ltd.*, 898 F.2d 1544, 1549 (11th Cir. 1990) and demonstrably "fall[s] below the lowest point in the range of reasonableness." *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983).

The Trustee asks to settle with debtor in the face of clear evidence that Mr. Rudnick is a fraudster who is abusing the bankruptcy process by laundering and hiding money through shell and alter ego companies and that, in those companies, he has millions more dollars that the Trustee's proposed settlement leaves in Mr. Rudnick's pockets. This evidence is outlined in submissions from Mr. Rudnick himself, records that are easily and publicly available, and in SC Advisors' Amended Adversary Complaint, which can be located at *In re Rudnick*, Adv. Case No. 20-04013-KKS (N.D. Fla. Bankr. Nov. 24, 2020)("Adversary Proceeding")(Doc. No. 13)(the "Adversary Complaint" or "Compl.")(incorporated by reference).

Particularly troubling: the Debtor, in his Motion to Dismiss SC Advisors' Adversary Proceeding, constantly attempts to use his hoped-for settlement as a basis for dismissing the Adversary Proceeding. *See* Adversary Proceeding Mot. Dismiss (Doc. No. 15), at pp. 5-6, 12, 23, 41. If the Court allows the settlement and also uses it as a basis for dismissing the Adversary Proceeding, Mr. Rudnick successfully will have manipulated the process to play the settlement against the Adversary Proceeding and escaped the consequences of his fraud, leaving SC Advisors without a remedy – or even a forum. The Court should deny, or at least defer, the settlement until it addresses the Adversary Proceeding. And it should resist the Debtor's invitation to regard settlement with the Trustee as an indication that the Trustee does not agree with SC Advisors that Mr. Rudnick committed fraud and is hiding money. To the contrary, the Trustee appears to believe that Mr. Rudnick is a fraudster who is hiding money, but that he has done such a good job at being a fraudster and hiding money in shell companies that it would be too expensive and difficult to get to the core of the fraud and find the hidden money. *See*, e.g., Mot., pp. 3-4 (acknowledging possible alter ego and other claims against Debtor), 7 (justification for weak settlement is expense, delay, inconvenience, and uncertainty of litigation, not that claims against Mr. Rudnick lack merit).

The Trustee's decision to leave millions of dollars of relatively low-hanging fruit on the vine is questionable for the reasons discussed below, casting doubt on whether it is proper, in this case, for the Court to give much deference to her recommendation. Moreover, to allow a dishonest debtor off the hook so cheaply and

easily sends a cynical message to the creditors and society about the justice of the bankruptcy process.

## BACKGROUND

Mr. Rudnick is not the "honest debtor" for whom the bankruptcy process exists to offer a fresh start. Compl., ¶¶ 1-3, 10-20, 30-147. To the contrary, he has committed fraud and hidden assets – long before, shortly before, and after – the petition date. *See id.* The SEC recently has accused him of committing fraud with respect to Mary A and other investments that hold assets that, once the corporate veil is pierced, should belong to the estate. Compl., ¶¶ 19-20; *see also* Docs. Related to *SEC v. Rudnick*, 3:20-cv-532 (W.D.N.C. Sept. 24, 2020)(attached to Compl., as Exhibits A and B). Tacitly acknowledging his wrongdoing, Mr. Rudnick has settled with the SEC and agreed to pay an $80,000 fine (it is unknown where he will obtain the money from that settlement, and the Trustee does not seem to have investigated the issue).

SC Advisors requests that the Court carefully review the Adversary Complaint in assessing the reasonableness of the settlement, but will summarize here some of the misconduct that it sets forth. As the Trustee acknowledges, Mr. Rudnick has operated for years through a complex web of shell companies (Mot., p. 2), and the Adversary Complaint shows how he uses those companies to hide his money and assets.

Capitol Capital Irrevocable Trust is – as the Debtor admits – at the center of many of Mr. Rudnick's chains of companies. *See* Mot. Dismiss (Doc. No. 15), p. 5. Significantly, the Trustee indicates that she is aware of this when she points out that,

as part of settlement, Mr. Rudnick will transfer to the estate Capitol Capital Irrevocable Trust's interest in Mary A II, another Rudnick alter ego. But even more significantly, the Trustee does not seem to question why Mr. Rudnick would be able to control funds in Capitol Capital Irrevocable Trust, for which he is supposed to be simply a beneficiary. If Mr. Rudnick can control those funds, he has access to far more assets for the estate than the Trustee is settling for.

For example, Capitol Capital Irrevocable Trust is the centerpiece in the archetypal illustration of how Mr. Rudnick used shell companies to move and hide assets that he still controlled – the Moteng Scam. Compl., ¶¶ 41-64. In that deal, Mr. Rudnick fraudulently took funds from investors, gave them to a partner he controlled (Dana Bradley, also being sued for fraud by the SEC), moved them through, and using, various entities named some variation of Moteng, and (without, as required, getting permission from or notifying SC Advisors) sold the Moteng assets securing the loan. *See id.* He then moved the proceeds through an entity called Black Orchid Equity, LLC, finally placing them in the same Capitol Capital Irrevocable Trust from which Mr. Rudnick pulls his interest in Mary A. As the Trustee and Court now know from the fact that he proposes to settle with the Trustee using Mary A assets from Capitol Capital Irrevocable Trust, Mr. Rudnick can simply take money and assets from Capitol Capital Irrevocable Trust whenever he wants.

The Moteng funds that are or were in the Capitol Capital Irrevocable Trust are just one example of many alter ego companies that the Trustee should have investigated and pursued for funds. Setting aside the Capitol Capital Irrevocable

4

Trust connection, there are other assets in shell companies that Mr. Rudnick controls, and that the Trustee should have demanded. Perhaps the best example is Southeast Lot, as discussed in the Adversary Complaint at paragraphs 65 through 79. Southeast Lot owns dozens, if not hundreds, of real estate parcels. SC Advisors, at one time, loaned Mr. Rudnick $1,600,000 to purchase and develop these lots. Compl., ¶ 69. Some of these lots were transferred to a company controlled by one of Mr. Rudnick's associates. Compl., ¶ 74. Since this seems to have been less than an arm's length transfer, the Trustee should have questioned (but does not appear to have investigated) when these transfers occurred and whether the assets could be clawed back.

SC Advisors understands that a large number of additional lots may still be under Southeast Lot's control, and therefore under Mr. Rudnick's control (since, as demonstrated in the Adversary Complaint, Southeast Lot is an alter ego for Mr. Rudnick). Compl., ¶¶ 66, 77-79. Leaving no doubt that Mr. Rudnick controls and can freely derive money from his various companies, he wrote in an October 25, 2019 letter to SC Advisors and other creditors, mere months before the petition date, that he would use Southeast Lot reserves to pay off debts associated with his companies, including Echelon, Southeast Lot, and Moteng. Compl., ¶ 77.

Foreshadowing his ability to take funds from the various companies at will that he used for the proposed settlement with the Trustee, the same letter proposed that he would use Mary A funds to satisfy creditors back in October 2019. Compl., ¶ 77. Of course, the creditors never saw the money. However, his ability to reach into

trusts and companies to obtain money at will – whether to offer to settle with creditors pre-petition or with the Trustee now – shows that these are not arm's length companies. They are shell companies and alter egos, as SC Advisors has been urging for well over a year in various lawsuits. And even as Mr. Rudnick freely takes and uses funds from alter egos like Mary A, he cheats the estate of the full value he can access. Just last year, for example, SC Advisors was told that the environmental mitigation bank that Mr. Rudnick owns through Mary A was worth $35 to $40 million.

As further evidence that Mr. Rudnick is using the various entitles described in the Adversary Complaint as his own, Capitol Capital Irrevocable Trust is not the only common thread between the entities. For example, lawyers Joseph R. Boyd, James M. Durant, Jr., or their law firm Boyd, Durant & Sliger, P.L., 1407 Piedmont Drive East, Tallahassee, Florida 32308 are listed as registered agent for many of the Rudnick Companies discussed throughout this Complaint including Mary A; Rudnick Development, LLC; Southeast Lot; Echelon; The Echelon One of Florida, Inc. Compl., ¶ 41(n). Mr. Durant is the named "trustee" of the Capitol Capital Irrevocable Trust. The Adversary Complaint contains several more examples of common connections between the entities, indicia of fraud, lack of corporate formalities and other factors necessary to pierce the corporate veil (which easily can be done here), and entities that likely still contain assets.

Finally, it is significant (and troubling) that Mr. Rudnick admits he owes creditors at least $17,810,000. The proposed settlement amount of $500,000 is only 2.8% of that amount.

## ARGUMENT AND ANALYSIS

As the Trustee correctly observes, the Court should consider the following four factors in deciding whether to allow the proposed settlement: (1) probability of success in litigation; (2) difficulties to be encountered in the matter of collection; (3) complexity of the litigation involved and the expense, inconvenience, and delay necessarily attending it; and, (4) the paramount interest of the creditors and a proper deference to their reasonable views in the premises. *Justice Oaks*, 898 F.2d at 1549.

Unfortunately, the settlement that the Trustee offers the Court misses all of these factors, to such an extent that it is not conceivably reasonable and cannot reflect sound business judgment. *See W.T. Grant*, 699 F.2d at 608. To the contrary, it appears that the Trustee has prematurely thrown in the towel at the first conclusion that this is an "extraordinary Chapter 7 estate." Mot., p. 2. But as Trustee admits, this is an "extraordinary" estate because of Mr. Rudnick's blatant use of "multiple direct and indirect interest in various limited liability companies" that, as SC Advisors' Adversary Complaint recounts, serve only to move around and house money and other assets that belong to the estate and that the Trustee could recover with minimal effort.

Instead of doing a little more work, Trustee settles for $500,000 – which is only 2.8% of the total debt – and Rudnick's interest in Mary A II, an asset that SC Advisors

has alleged belongs to SC Advisors and is not Mr. Rudnick's to bargain with. *See* Mot., p. 4; Compl., ¶ 100. Even the Trustee's willingness and ability to take Mary A, an asset that nominally belongs to the Capitol Capital Irrevocable Trust, reveals a major problem with the settlement: that Mr. Rudnick can exercise control and dominion over all of the shell entities discussed in the Adversary Complaint, including the Trust, an entity from which Mr. Rudnick should not be able to freely take and use assets as his own. The Trustee should obtain that money, not let Mr. Rudnick keep it.

1. ***Probability of Success in Litigation.***

The case against Mr. Rudnick is as close to a "slam dunk" as it gets in the unpredictable world of litigation. On November 24, 2020, SC Advisors filed a 62-page Amended Adversary Complaint that makes an extensive and well-supported case that Mr. Rudnick has used dozens of shell entities to hide assets and money from the past through present day. This network of shell entities, completely under his control and dominion, shares an infrastructure of common cronies like Dana Bradley (who, like Mr. Rudnick, the SEC is prosecuting for fraud), lawyers, a trust, registered agents, assets, failed fraudulent promissory notes, and *modus operandi*. The Adversary Complaint alleges that there is still "low hanging fruit," overlooked by the Trustee, contained in entities like Southeast Lot or under the control of other Rudnick associates or shell companies. Many of these assets would not be difficult to reach, and others are reachable with just a bit more effort.

As the particularity in the Adversary Complaint demonstrates, Mr. Rudnick is a career fraudster – a fact not seriously disputed by the Trustee – who has a history of misconduct. Even during the bankruptcy proceeding, for example, it emerged that Mr. Rudnick was using funds from one of his entities to pay the personal American Express expenses of himself and his wife. The SEC has alleged that Mr. Rudnick is a fraudster, and Mr. Rudnick has all but admitted it in his settlement with the SEC. Mr. Rudnick's closest business associates, such as Dana Bradley, are being prosecuted by the SEC or face criminal charges.

2. ***Difficulties in Collection.***

As discussed above and demonstrated in the Adversary Complaint, if the Trustee continued to litigate, she would want to pierce the corporate veil to pursue Mr. Rudnick's hidden assets. That process is relatively straightforward in this case, and SC Advisors has already mapped out much of the work for her. Once that small hurdle is overcome, the only difficult in collection would be posed by efforts by Mr. Rudnick to further hide or dissipate assets while this action is pending. To be sure, opportunities have been lost. For example, Moteng filed for bankruptcy in October, half a year after the petition date in this case. Had the creditors moved more swiftly, perhaps they would have found Moteng assets to collect. However, opportunities remain to capture low hanging fruit, including the opportunity to take the real estate owned by Southeast Lot. If the Trustee and creditors move expeditiously, hopefully they can recover those assets before they disappear.

3. ***Complexity, Expense, Inconvenience, & Delay of Litigation.***

No doubt, this is a complex case. However, the Trustee reports that she has already done much work, and she has counsel to assist her. Moreover, SC Advisors has done, and is doing much of the investigation and litigation, and also will assist the Trustee. Indeed, SC Advisors understands that part of the Trustee's rationale in desisting from litigation is that she believes SC Advisors will continue to pursue Mr. Rudnick in the Adversary Proceeding.

Having the Trustee continue to push back against Mr. Rudnick's fraud alongside SC Advisors will improve the probability that all the creditors will be able to reach the assets in Mr. Rudnick's companies and reduce the likelihood that he escapes with his pre- and post- petition fraud. SC Advisors is pursuing this litigation with limited, privately- supplied funds, having lost all of its money to Mr. Rudnick's schemes. Being able to share resources with the Trustee will broaden SC Advisors' panoply of investigative options and extend the amount of time it can continue to push for justice, in what amounts to a very unjust situation.

If the Court still allows the Trustee to settle, even though the Adversary Complaint roadmaps for the Trustee what must be done, SC Advisors requests that the Court order the Trustee to provide SC Advisors with its investigative file. This would include interview notes, memoranda, and any other material related to its investigation that SC Advisors could use to continue the work of untangling Mr. Rudnick's trail of fraud. This would, at least, create some minimal equity by allowing SC Advisors to avoid using resources to duplicate the work that the Trustee has done.

4. *Interests of the Creditors and Deference to Their Views.*

SC Advisors, as presented in the Adversary Complaint, has done the best that it can do with its limited resources to unwind Mr. Rudnick's fraud, identify assets in the shell companies, and make a case for piercing the corporate veil. In the Adversary Proceeding related to this case, it will soon depose Mr. Rudnick and his cohorts; subpoena documents and testimony from related parties and companies, including his lawyers and others with knowledge about the workings and purposes of Capitol Capital Irrevocable Trust, and prepare for a trial that will expose Mr. Rudnick's fraud. However, as clear and strong of a case as SC Advisors has already laid out, it needs the support of the Trustee and her resources to take this litigation to its conclusion.

Setting aside SC Advisors' need for help from the Trustee, this rubber-stamp settlement is very weak. It represents under 3% of the debt, and it appears that many other assets exist that have not been pursued. While acknowledging that Mr. Rudnick can take what he wants from the Capitol Capital Irrevocable Trust – and presumably his other companies – the Trustee declines to make him contribute easily-obtained assets to the settlement.

As everyone acknowledges, this is not a typical bankruptcy case – and Mr. Rudnick is not a typical debtor. He is a career-long fraudster, and this bankruptcy is yet another of his efforts to abuse the system to obtain an unfair benefit. The Trustee, rather than standing by and settling for too little, should be helping SC Advisors to

11

win this eminently- winnable campaign to expose the fraud and block the discharge of this patently dishonest debtor.

## CONCLUSION

For these reasons, the Court should decline to approve this underwhelming settlement, which is only favorable to Mr. Rudnick and breathtakingly unfavorable to the creditors. If the Trustee pushes more, particularly using the roadmap set forth in the Adversary Complaint, it will not take her many more resources or much more time to get more.

December 21, 2020.

/s/ William R. Terpening
William R. Terpening
N.C. Bar 36418

**TERPENING LAW PLLC**
221 W. 11th Street
Charlotte, NC 28202
terpening@terpeninglaw.com
(980) 265-1700

/s/ Andrew Grant Tretter
Andrew Grant Tretter
FL Bar No. 0160326

**ANDREW GRANT TRETTER ESQUIRE, PLLC**
750 Carica Rd.,
Naples, FL 34108
atretteresq@gmail.com
(516) 456-2657

*Counsel for Creditor SC Advisors 7, LLC*

**CERTIFICATE OF SERVICE**

I CERTIFY that a true and correct copy of the **SC ADVISORS 7's RESPONSE AND OBJECTION TO TRUSTEE'S MOTION TO APPROVE COMPROMISE OR SETTLEMENT WITH DEBTOR, JAMES RUDNICK** was served on the 21st day of December 2020, via electronic mail through the Court's CM/ECF System upon all parties on the attached CM/ECF Service List.

/s/ William R. Terpening
William R. Terpening